951 F.2d 828
 21 Fed.R.Serv.3d 716, 14 Employee Benefits Cas. 2559
 Donald G. ALLISON, Plaintiff-Appellant,
v.
William E. DUGAN, individually and as Trustee of the Midwest
Operating Engineers Pension Trust Fund and as agent of the
International Union of Operating Engineers, Local 150, Larry
W. Bushmaker, individually and as agent of Midwest Operating
Engineers Pension Trust Fund, Trustees of the Midwest
Operating Engineers Pension Trust Fund, and Midwest
Operating Engineers Pension Trust Fund, Defendants-Appellees.
 No. 90-2378.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 15, 1991.
Decided Jan. 10, 1992.
 
 Cora M. Vaughn (argued), Vaughn & Associates, Gary, Ind., for plaintiff-appellant.
 Louis E. Sigman, Dale D. Pierson, Bernard M. Baum, Alan H. Auerbach (argued), James M. Neuman, Baum & Sigman, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, COFFEY and MANION, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 From 1967 to 1983, plaintiff-appellant Donald G. Allison worked as an operating engineer. During that time, Allison was a member of the International Union of Operating Engineers, Local 150 ("Local 150" or the union). Allison's union membership required various employers to make contributions on his behalf to the Midwest Operating Engineers Pension Trust Fund (the "Fund"). The Fund is an employee pension benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 (1988) ("ERISA"). The Fund was established pursuant to a collective bargaining agreement in order to provide pension and related benefits to participants employed under the terms of the collective bargaining agreement. The Fund is administered by trustees who act under the authority of a charter known as the Agreement and Declaration of Trust and Pension Plan (the "Plan") and are subject to the governing provisions of ERISA. The trustees established a scheme of benefits and rules for eligibility and vesting consistent with ERISA's statutory requirements.
 
 
 2
 The terms of the Plan provide for retirement benefits when a vested participant reaches the age of sixty years. The Plan also provides an early retirement benefit package for participants who reach the age of at least fifty-five years but less than sixty years. The value of the early retirement package is calculated by reducing the normal retirement benefits according to a prescribed formula in the Plan. The Plan also provides other rules for qualification for benefits including the condition that a retired participant cease active employment in the industry except to the extent permitted in the Plan. Article XI, entitled "Suspension of Benefits," defines "Disqualifying Employment:"
 
 Section 6. Suspension of Benefits
 
 3
 (a) Before "Normal Retirement Age"
 
 
 4
 (i) the monthly benefit shall be suspended for any month in which the Employee is employed in "Disqualifying Employment" before he has attained "Normal Retirement Age."
 
 
 5
 "Disqualifying Employment" means employment or self-employment of the type that is described in the following Sub-paragraphs:
 
 
 6
 (A) in the construction industry or any other industry in which Employees were employed as Operating Engineers and accruing Benefits under the Plan at the time Pension Benefits commenced or would have commenced, if the Employee had not remained in or returned to such work; or
 
 
 7
 (B) in the same 'trade or craft' in which the Employee was employed at any time while covered by the Plan or supervisory activities relating to such trade or craft. Trade or craft extends to any job or occupation using the same skill or skills.
 
 
 8
 Plan, Article XI, Section 6, Appellees' Appendix at 13.
 
 
 9
 Allison became eligible for early retirement benefits under the Plan on or about March 1, 1988. On February 22, 1988, Allison applied for early retirement benefits, which were approved on or about May 6, 1988. At that time, Allison was working as General Manager of Taylith, Inc. In a letter dated May 3, 1988, and signed by William E. Dugan, Chairman of the Board of Trustees of the Fund and President of Local 150, the union demanded that Allison recognize it as the collective bargaining agent of Taylith, Inc.'s employees. Allison refused because Taylith, Inc.'s employees already were represented by another union.
 
 
 10
 As the excerpted portion of the Plan reveals, a pensioner cannot be working in disqualifying employment, otherwise his benefits will be suspended until he ceases such employment. At the time of his application for early retirement benefits, Allison received a complete copy of the Plan's rules on the suspension of benefits. To enforce those provisions of the Plan, the Fund's Administrative Manager is authorized to investigate whether a pensioner is working in disqualifying employment. If the Administrative Manager determines that the pensioner is in fact violating the Plan's stricture against disqualifying employment, then the pensioner is notified and afforded the opportunity to appeal the Administrative Manager's determination before the Appeal Review Panel. This panel consists of two trustees, one of whom is appointed by the participating union and the other by the participating employers. The trustees have delegated to the Appeal Review Panel the authority to make factual findings and binding determinations in all such cases.
 
 
 11
 In June 1988, one of the trustees informed Administrative Manager Larry Bushmaker that Allison, as supervisor for the Taylith Company, might have been engaged in disqualifying employment within the meaning of the Plan. In the course of his investigation, Bushmaker sent Allison a letter requesting a full description of his employment. Bushmaker determined that Allison's employment came within the definition of "disqualifying employment" and suspended his benefits. Allison exercised his right to appeal Bushmaker's determination. The Appeal Review Panel affirmed Bushmaker's conclusion that Allison's work violated the Plan and demanded that Allison refund all pension benefits previously paid. Allison requested, and was granted, a reconsideration hearing, but the panel only reaffirmed its earlier decision.
 
 
 12
 On October 5, 1989, Allison filed suit to recover his suspended pension benefits and redress an alleged breach of fiduciary duty against the Fund, its trustees, Bushmaker, and Dugan (collectively, the defendants). Both Bushmaker and Dugan were sued individually and as agents of the Fund. Allison alleged that the trustees terminated his pension benefits in retaliation against him because he refused to allow Local 150 to represent Taylith, Inc.'s employees and that Dugan, acting as an agent of Local 150, ordered the suspension of his benefits.
 
 
 13
 On October 30, 1989, the Fund filed a counterclaim that sought to enforce its decision to suspend Allison's benefits and to recover the benefit payments that Allison already had received. On that same date, all the defendants filed a motion to strike from the amended complaint Allison's demand for a jury trial and his claims for punitive damages. The Fund then filed a motion for summary judgment on its counterclaim.
 
 
 14
 Several months later, the district court granted both the Fund's motion for summary judgment and its motion to strike the jury demand and punitive damages from Allison's amended complaint. See Allison v. Dugan, 737 F.Supp. 1043 (N.D.Ind.1990). The district court then struck Allison's claim for compensatory damages sua sponte and imposed sanctions under Rule 11 of the Federal Rules of Civil Procedure, ordering Allison to pay the reasonable fees and costs incurred by the defendants in filing the motion to strike. Finally, in granting the Fund's motion for summary judgment on the counterclaim, the district court entered judgment against Allison and in favor of the Fund in the amount of $1,865.10, which represents the retirement benefits Allison already received. On May 31, 1990, by stipulation, the remainder of the case was dismissed without prejudice. Allison appealed.
 
 
 15
 On appeal, Allison makes two claims: that the district court erred by using the arbitrary and capricious standard when reviewing the Fund's Appeal Panel's decision to suspend Allison's benefits and that the court erred when it found that no material issue of fact existed that would preclude granting summary judgment for the Fund on its counterclaim. Specifically, Allison argues that the Supreme Court rejected the arbitrary and capricious standard for cases arising under ERISA in Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Furthermore, Allison maintains that because he alleged that his pension benefits were suspended in retaliation for his refusal to recognize Local 150 as the bargaining agent for Taylith's employees, the trier of fact should have been permitted to determine whether the defendants acted in bad faith, and, thus, summary judgment for the defendants was inappropriate. See Appellant's Brief at 14. We are not persuaded. On the contrary, we hold that the district court ably applied governing law in resolving this dispute.
 
 
 16
 In Firestone Tire and Rubber Company, the Supreme Court determined that a decision to deny benefits, brought under 29 U.S.C. § 1132(a)(1),[1] must be reviewed under a de novo standard (instead of the arbitrary and capricious standard previously employed) "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 946. Subsequent case law made it clear that, absent an express grant of discretion to the trustees of a plan, the de novo standard controls. See Egert v. Connecticut General Life Insurance Co., 900 F.2d 1032, 1035 (7th Cir.1990). Nevertheless, when a trust agreement expressly gives the trustees discretionary authority to make binding benefit determinations, the appropriate standard of review remains whether the decision or conduct was arbitrary and capricious. See Bali v. Blue Cross and Blue Shield Association, 873 F.2d 1043, 1047-48 (7th Cir.1989). See also Reilly v. Blue Cross and Blue Shield United of Wisconsin, 846 F.2d 416, 419 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988).
 
 
 17
 In the instant case, the Fund's trustees specifically were granted the discretionary authority to resolve issues involving the interpretation and application of the Plan. The Plan provides:
 
 
 18
 [T]he trustees, as named fiduciaries, are authorized: ... (b) to determine all question arising in the administration, interpretation and application of the pension plan, including questions of eligibility of employees, the status of the participants and their beneficiaries, and any other person thereunder. Unless otherwise in this agreement and declaration of trust provided, determination made by the trustees, as the "named fiduciaries," in the determination, interpretation and application of the pension plan shall be binding on all persons.
 
 
 19
 Allison, 737 F.Supp. at 1053. Moreover, the following excerpt removes any lingering doubt about the Plan's express grant of discretion to the trustees:
 
 
 20
 In the administration of the pension plan, the trustees, consistent with the purposes of the trust fund shall have power and authority to: ... (e) to decide all questions or controversies arising in any manner or between any parties or persons in connection with the trust fund or the operation thereof, whether as to any claim for benefits made by any employees, or any person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the trustees or established by this instrument, or as to any writing, decisions, instrument, or account or otherwise, and the decisions of the trustees, if made in good faith, shall be binding upon all persons dealing with the trust fund or claiming any benefits thereunder.
 
 
 21
 Id.
 
 
 22
 Despite the explicit clarity of this grant of discretion to the trustees, Allison contends that the arbitrary and capricious standard should not apply because, as he alleged, the defendants acted in bad faith when they suspended his benefits. See Appellant's Brief at 11. This argument misses the mark. The arbitrary and capricious standard already includes a good faith requirement. In Reilly, we articulated the standard as "whether [the company's] decision was arbitrary, capricious or motivated by bad faith...." 846 F.2d at 419 (quoted in Egert, 900 F.2d at 1035). Thus, as the defendants responded, the issue of bad faith goes not to the question of which standard to apply, but whether that standard was met. See Appellees' Brief at 17 n. 3. The district court, then, appropriately applied the arbitrary and capricious standard to Allison's claims.
 
 
 23
 Nor did the district court err by granting summary judgment to the Fund on its counterclaim. Allison argues that, because he alleged that the defendants suspended his benefits in bad faith, the issue of motive was a disputed material fact that should have precluded summary judgment. Allison's argument is misguided; simply claiming that the trustees acted in bad faith without offering any support for that contention is not enough to prevent entry of summary judgment for the defendants. Although the burden is upon the moving party to establish that no material facts are in genuine dispute, see Donald v. Polk County, 836 F.2d 376, 378 (7th Cir.1988), to preclude summary judgment, the non-moving party must demonstrate that a material issue of fact exists. Beard v. Whitley County R.E.M.C., 840 F.2d 405, 410 (7th Cir.1988) ("A party who bears the burden of proof [at trial] on a particular issue may not rest on its pleadings, but must affirmatively demonstrate by specific factual allegations, that there is a genuine issue of material fact which requires trial."). See also Celotex Corporation v. Catratt, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("[T]here can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of a non-moving party's case necessarily renders all other facts immaterial.").
 
 
 24
 In granting the defendants' motion for summary judgment, the district court concluded that the Appeal Review Panel's decision which found Allison to be working in "disqualifying employment" within the meaning of the Plan, was neither arbitrary nor capricious. The district court simply found no indication that the trustees acted improperly, exceeded the scope of their authority, or abused their discretion. Allison offered no evidence--nor anything more than a far-from-specific allegation--to suggest that bad faith played any part in the Fund's decision to suspend Allison's benefits because he was found to be working in disqualifying employment. Specifically, the district court noted
 
 
 25
 Allison ... failed to demonstrate that either Bushmaker or the Appeal Panel failed to consider some important aspect of his situation, offered an explanation for the decision to suspend his benefits that runs counter to the evidence, or reached a decision which was so implausible based on the evidence that it could not be ascribed to a difference in view.
 
 
 26
 Allison, 737 F.Supp. at 1054. The district court observed further that
 
 
 27
 While the defendant's (sic) concede that [one of the trustees, who was also a union member,] derived great pleasure from being able to turn Allison in, it would have been a breach of [that trustee's] fiduciary duty to the Trust Fund and those participants who were not engaged in "disqualifying employment," for [that trustee] to have overlooked the fact that Allison may have been engaged in "disqualifying employment." Thus, that fact that a union member who is also a trustee turned Allison in is not persuasive evidence that the ultimate decision to suspend benefits was arbitrary or capricious ... The record does, however, demonstrate that Bushmaker's decision, which was affirmed by the Appeal Panel, was based on a good faith, discretionary, interpretation of the Plan....
 
 
 28
 Id. at 1057. We agree with this reasoning. The fact that one of the trustees "turned Allison in" is simply not sufficient evidence of bad faith to prevent a well-supported motion for summary judgment. Thus, the district court properly granted summary judgment for the Fund.
 
 
 29
 Yet, even though Allison chose not to challenge specifically this element of the district court's decision, we refuse to affirm the imposition of Rule 11 sanctions. The district court sanctioned Allison because "[he] ignore[d] the controlling case law and instead ... pretended that potentially dispositive authority against [his] position does not exist...." Id. at 1051. We will reverse a decision regarding sanctions only if the district court abused its discretion. Mars Steel Corp. v. Continental Bank, 880 F.2d 928, 930 (7th Cir.1989). In the instant case, though Allison's arguments were undoubtedly weak, we do not detect the kind of callous disregard for governing law or the procedures of the court that usually justifies the imposition of Rule 11 sanctions. With this dearth of facts that support sanctions, we hold that the district court abused its discretion. Therefore, we AFFIRM the district court's grant of summary judgment in favor of the defendants, but we REVERSE its decision to impose sanctions under Rule 11.
 
 
 
 [1]
 Section 1132(a)(1) provides that "a civil action may be brought ... by a participant or beneficiary [of a covered plan] ... (A) for the relief provided for in [§ 1132(c) ], [and] (B) to recover benefits due to him under the terms of his plan."